Case number 13-3969, Scott Arent v. Napier Shaik. Counsel, they are going to present. If you'd approach the podium and identify yourselves first, we'd appreciate it. Good morning, your honors. James Smith on behalf of Scott Arent, the adult. And good morning, your honors. My name is Tom Patterson. I'm the attorney for the two defendants, Dr. Shaik individually and the Dr. Schatz corporation as well. All right, thank you very much. So we'll start out with 15 minutes per side, and the appellant may reserve time for rebuttal if you so wish. And you may proceed whenever you wish. May it please the panel, counsels, ladies and gentlemen. This appeal comes before you as a result of a business transaction between the plaintiff and the defendant regarding a pet shop. There was a contractual relationship between the two parties, one to purchase the pet shop for a certain amount of money, as well as an employment contract between Dr. Shaik and his company and my client, Scott Arent. Scott Arent is on here. Stop for a minute. You did not file a post trial motion here, correct? That's true, we did not. Doesn't that forfeit this issue? It does not. Show me a case that says that. Well, it's a fact-specific situation here, Judge. The trial judge specifically ordered and stated that if the issue was brought up again, she would issue an order of mistrial. That is in the record. It is in the transcript. And we, as the plaintiff, were prohibited from bringing up the issue of the objection to what is basically motion number five. I'm not going to the substantive matter. I want to figure out how, as an appellate justice, can we decide this issue when there was no filing of a post trial? Well, first of all, the court is not prohibited from considering any of the issues in this appeal. The forfeiture rule only applies to the litigants, the parties. So if we failed to file a post trial motion that has no basis, in other words, we improperly did this, then the court, the panel, still has the ability to consider the appeal on its merits. There is no restriction on it. But I think more importantly, the panel should take into consideration the facts and circumstances of this case, where the trial court, in no uncertain terms, stated that if the issue was brought up again at any time, the mistrial order would be immediately entered. But my question is, can you pinpoint a case or give me your best case that we could rely on and we could say that this is not a forfeiture? That this is not a what, Judge? A forfeiture. That's what they call a waiver. I understand. The forfeiture cases. I mean, I've read every forfeiture case that I could find in this country, and I can't really find anything that helps you. Maybe you have something that I don't know about. Other than the cases that we have in our brief, I don't have a specific case on this particular issue. Okay. Proceed. Thank you. So the issue before the courts is whether or not the trial court's order restricting any and all testimony regarding what I refer to as the stealing of money by the defendants. So here's the facts of this case. My client, Marion, after he had owned this pet store successfully for over 20 years, sold it to Dr. Shea. My client, although he was responsible for collecting the day's receipts and making the deposit, he did not have any responsibility for the check. So he would take the day's receipts. He would either take it to Dr. Shea, or you'll see the name Dr. Gauss, which is Dr. Shea's nephew. And he was to take the deposits, show them to Dr. Gauss, and then deposit them in the bank. What Dr. Gauss did was, every single day, he would take $500 of cash from the day's receipts. So the day's receipts from the pet shop were short $500 every day, $15,000 a month. This was the testimony that was to be elicited by the plaintiff that was barred by the trial court. The trial court barred Schuyler from testifying to his direct observation and his direct actions that were done at the request and the direction of the defendants. So how was the taking of this $500 in cash on a daily basis relevant to the issues being litigated? Two ways, Judge. The first way was that Dr. Shea said that he was not required to complete the payment for the purchase of the pet store because it was financially insolvent. And he used the word insolvency in front of the jury numerous times, both counsel for the defendant in his opening and closing and the doctor during his testimony. The insolvency was even defined for the jury. And the question of insolvency was basically that the business didn't make enough money to support itself. The insolvency was a negative $114,000 for the year. The amount of money that was skimmed was $180,000. Had the jury been allowed to hear the testimony regarding the skimmed $15,000 a month, the business would not have been insolvent. The second issue was the employment contract that involved Schuyler in the agreement with Dr. Shea. The employment contract allowed the termination of the contract for, I'll refer to it as non-performance, malfeasance. And I don't want to say that in a legal term, but it was basically that Schuyler wasn't doing his job. And the test, the basis of whether Schuyler was doing his job as the manager of the pet shop was whether or not the pet shop made money. And the defendant argued that the pet shop didn't make money, and therefore Dr. Herriot was justified in terminating the contractual relationship. Was it the agreement of terminal by will? It was not. The defendant argues that, that it was terminal by will. There were three ways to terminate it. One is, well, there were a number of different ways, none of which occurred here. For example, if he worked for a competitor, or if there were any financial documents that showed it was negative, none of those triggers occurred. It was not terminable at will. It was terminable by mutual agreement, which didn't occur here. The reason it was terminated, or at least argued by Dr. Shea, was that Schuyler didn't perform because the business was losing money. What the jury didn't hear is the reason the business was losing money is because Dr. Shea was skimming $15,000 a month. So what was the trial court's reasoning for not allowing this business? The trial court stated on the record that she had done a, that Her Honor had made a balance of dollars. And that in her opinion, the suggestion that there was some kind of criminal activity, or that there was some kind of skimming that was going on, outweighed the probative value of the jury hearing that the money wasn't put into the business, or improperly sidelined or skimmed from the business. And there was extensive argument at trial about what could and couldn't be stated in front of the jury. The problem was, is that Arian was prohibited from testifying to exactly what he saw, which was the $500 per day that was removed. What made Arian's testimony credible, and why the jury should have heard this, is even though Schuyler did not have any authority to write checks or control the checkbook, he had the ability to look at the checkbook on the electronic bank statement. In other words, he could go on the computer and see the deposits that were made for the entire year and a half that he was there. Not once was any of the $500 deposited into any account that had anything to do with the pension. Wasn't that part of the basis of the trial court in excluding the evidence, is that there was no testimony to determine what happened to the $500? That was part of the trial court's ruling, yes, Your Honor. The problem with that ruling is, is that all he had to be, all he should have been able to do was testify as to what our observations were. If the defendants had documents to say, well, no, this money was deposited into the account, or it was used to pay payroll taxes, or it was used to pay something else, that's fine. We have no problem with that. The problem is the defendants couldn't do it. There was no ability on the part of the defendants to prove that this money went anywhere other than Dr. Shakespeare's pocket. The issue that was brought, that should have been, the way it should have been ruled about is either allow the testimony into the trial court regarding the spending of the $15,000 a month, or disallow the defendants from testifying that the business was insolvent, because the business would not have been solid if the money had been allowed to be testified to as to the $500 per month. This was not an insignificant sum. And the appeal that's before you is the issue of barring the plaintiff from testifying in the issue of this $15,000. And we would ask that the ruling would... To get back to Justice Gordon's initial query, are we to understand your argument that the reason why you didn't follow the statute and file a motion for a post-trial motion was because the judge had said, I don't want to hear from you anymore about this, and if you do this, I'm going to grant a mistrial? Absolutely. But isn't the threat of a mistrial over at this point? I mean, the trial's over. You already lost. So what do you have to lose to file a motion for a new trial? Otherwise, the judge will get mad at you. And I know that experienced litigators, you know, they take that risk all the time. I'm sure they do. And I appreciate that. And I agree with the court that litigators should not be intimidated by the trial courts. The issue here, though, is the threat of the mistrial was there even after the trial was over. She, the trial judge, had the ability to change the verdict, to do a motion notwithstanding the jury. The court had absolute discretion and the power to do anything in that case. The plaintiff in this case was facing... Because there was a counterclaim that maybe somehow, if you raise this again, contrary to the court's order, that even though you had lost your claim, that there would be a mistrial with regard to the other claim? Absolutely. Absolutely. I would ask the panel to look at the transcript. These words were not to be misconstrued. The order of the court was crystal clear that if the mention of the money was made, there would be a mistrial. And so the plaintiff was faced with the dilemma of violating the court's order, direct order, and risking a mistrial and or filing a written post-trial motion.  Thank you, counsel. May it please the court and counsel, first to deal with the issue of the post-trial motion. The suggestion of mistrial was made by Judge Brennan only after there was some questioning by Mr. Smith of the witness in front of the jury. And the statement was made in a sidebar conference. There was no suggestion that the judge was going to hold Mr. Smith in contempt if he filed a post-trial motion complaining of her evidentiary ruling. And if you look in fact- So your point is that they were proceeding in violation of the court's already made rulings. That's correct. And then she said, if you do this again, I'm going to grant a mistrial. That's correct, Judge. There was no suggestion that if counsel argued it in sidebars or outside the presence of the jury at any time that some mistrial order would be entered. And that's just an improper, unfair misrepresentation of what happened. In fact, didn't the trial court say that it wasn't going to declare a mistrial on the record? Yes, absolutely right, Judge. You know, counsel at no time was threatened with contempt. He was not prevented from filing a post-trial motion. And in fact, I believe if you look at the record as a whole, you will find that this judge permitted argument and re-argument and re-argument at length over this issue and many other issues that opposing counsel raised. And in my view, showed exemplary patience with respect to this. I don't think Rule 366 or 521202 be idle or aspirational rules. I think a post-trial motion is required. There's no question the judge, the court, this court has the power to do anything. I don't deny that. But the trial court's opinion on a post-trial motion is not some sort of idle issue. I think the appellate courts, at least from the opinions that I've read, always value the observations of the trial court that are made not only during the trial but also with respect to post-trial motions. And this was denied here. None of the cases that they cited in their brief deal with a situation where no post-trial motion was filed and no opinion of the trial court was obtained. And then move, anyway, to what they have alleged as the claim of error. Now, there were two contracts in this case. One contract was entered into between Scott Ariant and Dr. Shake individually. And the other contract was entered into between Scott Ariant and the corporation. And contrary to what appellate counsel argues in their brief, the court ruled that these contract documents could not be read together because they were not entered into by the same parties at the same time. We can find that at Record of Proceedings 550-51 and 563-65 in our appendix at pages 50 to 51 and 52 to 55. They haven't complained about that ruling. It was not part of a notice of appeal. It wasn't part of their initial brief. And under Rule 341, then, the fact that they are separate agreements, one to the individual and one to the corporation, cannot be complained of. I respectfully suggest that there is a mistake, both at page 7 of their brief and at page 2 of their reply, when they say that there were three sections to one contract, that is, against the explicit ruling of the court, and basically indicates an effort to maintain their position against all evidence in the record, even after it was pointed out by us. Now, with respect to the contract entered into with Dr. Shake individually, that's at C-13, and it's also in the appendix. It's a one-page agreement done without lawyers. It lacks a duration term, and so it is comparable as well. It is mistaken to say that there was a duration term in the contract with Dr. Shake individually. There was no duration term in that contract. With respect to the five paragraphs of that agreement, this could be stopped at any time because it was terminable at will. And it also said that there were two things that had to be done. One, there had to be a closing before any of the obligations under this document came into effect, and there was no closing. And there was an explicit admission by Mr. Heria to that effect, and Dr. Shake testified to the same thing. Excuse me. So when Counsel refers to this agreement as being, you know, with regards to employment as being mutual, you said there was a mutual agreement in terms of modifications and so on and so forth. Yes. That it wasn't terminable at will. Which document is he referring to? What contract is he referring to? The contract between Scott Arian and the corporation had a three-year duration term. And I can get to that immediately if the Court pleases. But I would just point out, just to clean that up, the contract that was entered into by Dr. Shake individually, there was no closing, and he didn't submit the credit card statements by the date specified in that agreement. There was a jury instruction that said Dr. Shake didn't have to comply with that one-page contract individually if those two factors were proven. And it was set forth in the jury instructions without objection. It was arguably closing without objection, and the jury found against Scott Arian on the claim against Dr. Shake individually. Now, let me then refer to the contract with the corporation, because they did have a duration term. I don't deny that. That contract said, and that's found in Appendix A-1 through A-3, the parties may terminate this agreement by written mutual agreement. And it also then says in paragraph 5, the company may terminate the employee for gross misconduct, neglect of duty, conflict of interest, or noncompliance with this agreement. It is true, only in part, that as Mr. Smith, opposing counsel, states, that insolvency was an additional ground of termination. But that was not the only ground of termination, and it was not the only ground presented by the evidence of termination. It was not the only ground of evidence submitted by the jury instructions for termination, and it was certainly not the only ground argued by me and by Mr. Smith with respect to termination. The evidence on the record at 438 to 39, and also at 316, shows that Exhibit 47 was submitted by Scott Arian. And he said, I know you're mad at me. If you don't want me to work anymore, just let me know. And after that, Dr. Shake terminated. That was his evidence, and that was Scott Arian's evidence, and I cited the record pages to that effect. Additional ground, gross misconduct, or neglect of duty, he failed to balance the checkbook. He admitted that at Record of Proceedings 411 to 13, and also at 432. And was argued in the closing arguments at 758 and 759 without objection, and it was a matter that was subject to the jury instructions as well. There were requests for information that was argued, and he said he even threatened to beat up someone for the request for information. That's found at the record 273 to 276. In the conflict of interest provision of the contract was violated as well, because he used corporate money to pay personal debts. He favored his personal interest in paying the debts versus the corporation's interest in having only corporate expenses paid for. That can be found in the explicit admission by Scott Arian at Record of Proceedings 410 and 11, and also at 278 to 81 by testimony by Dr. Shake. It was argued by me in closing at the record at 760 without objection. It was subject to the jury instructions without objection, and there's certainly no complaint about the jury instructions that were issued on this appeal. So with respect to all of that testimony, it's clearly insolvency was not the only sole basis for the argument at the trial, and it was not the only basis put forward. But it was one of the bases. Yes, it was. All right. So how do you justify the court's ruling if insolvency is one of the grounds it's being relied upon, and they're coming forward with evidence that $15,000 a month is getting skimmed, how do you justify the ruling keeping that out? Sure. A couple of things. Number one, skimming is the removal of cash from a victim entity prior to its entry in the accounting system. That's the standard definition of what skimming is. You can find it in the certified fraud examiner's manual. There's no testimony by a certified fraud examiner here that skimming had taken place. So the question is, who kept the books for the pet shop? Scott Arrien. Who provided evidence as to what the income from the pet shop was? Scott Arrien. By all accounts, the idea of this transaction was infuse some cash from Dr. Shakey into this transaction and have Scott Arrien run the pet shop with this infusion of cash. He would be in charge. Dr. Shakey had three different locations for medical practice. He didn't want to run the pet shop. So Scott Arrien was in charge of those books. There was no connecting up to show that Scott Arrien himself deducted the $500 from the gross receipts for documents that he kept with respect to the pet shop, and there was no suggestion that it didn't match up with the total revenues of the pet shop. In other words, he couldn't explain what happened to the money and wasn't going to try to. There was no additional witness that he was going to bring in that was going to supply any of the missing evidence with respect to the financial records, the bank records, deposition records. Dr. Gauss was not going to be called to testify. It wasn't listed by either side. Simply put, there was no evidence. There was not going to be any evidence that that $500 a day didn't make it into the books. Right. Right. And so the judge went through in detail what the accounting report with respect to the register was. So there was nothing about that. So both under 602, there was no foundation for the evidence, and she also explicitly stated that it was unduly prejudicial under Rule 403, that balancing the probative value of that evidence against its potential prejudice to assert that Dr. Shade or someone on his behalf was skimming a crime was just getting into some collateral issues that weren't relevant to the primary issues in the case. So, therefore, I think she made an appropriate balance under 403, and she made an appropriate ruling under 602 with respect to compensation. One final, couple of final notes. The testimony is that Dr. Shade invested about $160,000 in this pet shop for 100% ownership. So they're suggesting that there was $180,000 in cash every year from this $160,000 investment. And it's undisputed that the pet shop went out of business. It was significantly in debt when Scott Arion ran it, and it was closed down shortly after by Dr. Shade. Now, no one closes a business that's making $180,000. No one does that. We're not required to leave our common sense at the door of this court. There was no 120% return on his investment. The $180,000 is a fantasy. And he got sued by the landlord for $400,000. I handled that case. We had to litigate it and settle it. We borrowed money to pay off- Is that in the record? I think the fact that we- Well, it just went out- I'm sorry. Sure. I don't recall how much detail on that there was. Okay. But the closing down of the pet shop, I think, renders this $180,000 as a fantasy. And I also respectfully suggest that the overwhelming evidence was against Mr. Arion. When he said he made $70,000 a year, he was impeached by his tax returns that showed he made $90. When he said he had personal debts and that was paid with corporate money, I think he lost credibility in front of the jury. When he said he was confused about what the word closing meant when it was used in a document that he and Dr. Shaik drafted individually, I don't think he had a lot of credibility there. He admitted that it was not a good business practice to draft checks for Dr. Shaik's signature when there was insufficient funds in the bank account. You've heard opposing counsel say he had access to the bank account and there was undisputed testimony that their checks were bounced. And he claimed that his letter that, I know you hate me and if you want me to resign, let me know, didn't actually mean he wanted to resign. How credible is that? What else could it mean? So I respectfully suggest that there was a sound basis on Rule 602 and 403 for the judge's ruling. That it didn't affect 80% of the grounds alleged for termination. And under this court's strong precedent, all grounds are being held against the loser in the trial. The absence and failure to file a post-trial motion. The absence of a good faith reason for doing so. This idea of a mistrial is, with all respect to opposing counsel, just an unwarranted statement about what Judge Berman did. So I respectfully request that you affirm the ruling of the trial court. Thank you. Thank you, counsel. Mr. Smith? Thank you. I thought what was interesting in the defense's argument here is that there is no denial that the money was taken. There's a lot of issues regarding other arguments that were made at trial and other reasons why the plaintiff should or should not have won or why the defendant should or should not have won. But the bottom line is that the decision of the trial court to bar the plaintiff from testifying to his direct evidence, his direct knowledge, his direct observation that the money was spent was so prejudicial. That even under, and Justice Gordon, you asked for a case in our brief where error is found and applied in several cases where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process. I submit to you that that's the case here. How was plaintiff supposed to make and respond to the defendant's arguments that he was guilty of gross misconduct, that he was negligent of duty, that the pet shop was insolvent when the $186,000 amount of money that would have addressed all of those issues in front of the jury was prohibited by the trial court? The defendants do not deny that the money was spent. Scott Erick could not control the checkbook and therefore was not, could not be held responsible for the checks dated in that balance. Scott was acting at the direct direction of Dr. Sheik when he was told to give the $500 a day to his nephew. And all the books of this business were shown to the jury as part of the argument that the business was insolvent. And those books and records didn't refer to and didn't have the $15,000 a month in it. I submit to you that this error was such of a prejudicial nature that regardless of whether or not the plaintiff filed a written post-trial motion, it screams, it seeks, it demands that the panel at least consider the plaintiff's motion, the plaintiff's appeal on this important issue. Therefore, we would ask that the ruling be reversed and that the court issue a non-consistent with the plaintiff's appeal request. Thank you, counsel. Thank you. Thank you. The court appreciates your presentations today and your excellent briefing. And we will take the matter under advisement. And you'll hear from us as soon as we can get it. Okay, thank you very much. Thank you.